## 8101. WESTERN & ATLANTIC RAILROAD CO. *v.* JACKSON.

1. Where a female passenger about 60 years old was carried by a railroad-train past a flag station which was her destination, through the negligence of the conductor in charge of the train, in failing to stop the train at that place, and the conductor, when the train stopped at the next station, said to her that he would have a conveyance to take her from there to her home, and she then left the train and he requested a telegraph operator of the railroad company at that station to hire a conveyance and send her to her home, and the telegraph operator engaged a young man about 21 years old to convey her in a buggy to her home, about two miles distant, and on the way the driver made improper proposals to her, the driver could not be held to be an agent of the railroad company, in the absence of any evidence that would authorize the jury to find that either the conductor or the telegraph operator was specially authorized to employ a subagent, or was acting within the scope of his authority in engaging the driver; nor was the injury to the feelings of the person insulted by the driver a proximate result of the breach of the railroad company's contract of carriage.

2. Even if it be conceded that both the conductor and the telegraph operator were charged generally with the duty of providing for the safety of the passenger at the station, and that therefore the carrier would be responsible if there was negligence on their part in entrusting her to a drunken or dissolute man, there was no evidence to support the inference that when the driver was engaged to transport her to her home, either the telegraph operator or the conductor knew anything whatever derogatory .to his character or habits; but, on the contrary, the undisputed evidence showed that the employee who engaged his services knew him to be a man of previously unblemished reputation, and had no reason even to suspect that he was a drinking man or had been recently imbibing intoxicants, or to anticipate (in the light of his reputation and apparent condition) that he would be capable of insulting an elderly woman entrusted to his care. Therefore no recovery against the railroad company on this theory was authorized.

3. While a recovery of nominal damages would have been proper under the evidence, the verdict for $1,000 was unauthorized; and the trial judge erred in overruling the motion for a new trial.

DECIDED SEPTEMBER 27, 1917.

Action for damages; from Bartow superior court—Judge Fite. March 27, 1916.

Mrs. Malinda Jackson sued the Western & Atlantic Railroad Company, alleging that on September 5, 1914, she boarded its passenger-train at a point called Atco in the county of Bartow, and informed the conductor in charge of the train that she wished to leave the train at Cave, another station, and paid the fare to that point; that the train did not stop at Cave, but, without slackening its speed, ran by that station to Kingston, in the same county, and about two miles beyond her destination; that after passing Cave she did not see the conductor until just before the train reached Kingston, when she reminded him that she had been carried beyond her destination, whereupon the conductor told her he had forgotten "that she was to get off at Cave, and assured her that he would procure a conveyance at Kingston for her return to Cave." She further alleged: "that on his arrival in Kingston said conductor instructed the employees of the defendant company at that place to procure a conveyance for petitioner and to send her back to Cave; that said employees (petitioner does not know their names) did procure a horse and buggy, with Moses Darden as driver, and that one of said employees placed her in said buggy with said Darden;" that it was 7:30 o'clock p. m. and was dark when she arrived at Kingston; that soon after she left Kingston in the buggy with Darden she noticed that he was drunk,

and on the road between Kingston and Cave he made indecent proposals and repeated requests that she have sexual intercourse with him; that on account of his indecent language and proposals she became greatly frightened and begged him to permit her to alight from the buggy in the night and proceed to Cave on foot, but he refused to allow her to alight, and she finally reached her destination, not earlier than 8 o'clock. She alleged that the defendant was negligent: " (*a*) in failing to stop said train at Cave and allowing petitioner sufficient time to alight therefrom; (*b*) in carrying petitioner beyond Cave, her destination; (*c*) in procuring an incompetent, drunken servant to carry her from Kingston to Cave; (*d*) in making, through said Darden, indecent proposals to petitioner, grossly and wantonly insulting her and humiliating her; all to the injury and damage of petitioner in the sum of ten thousand dollars aforesaid." She prayed for a judgment for that amount.

The defendant demurred to the last clause of paragraph 5 of the plaintiff's petition setting forth that the conductor "assured her [the plaintiff] that he would procure a conveyance at Kingsston for her return to Cave," and to those paragraphs of the petition setting forth the conduct of the conductor and the other employees of the defendant company and the insulting conduct of Darden on the road from Kingston to Cave, and also to subdivisions *c* and *d* above quoted, alleging negligence in that the defendant had procured an incompetent and drunken servant to carry her from Kingston to Cave, and in making through him indecent proposals; and for cause of demurrer the defendant insisted that the averments of these paragraphs and parts of paragraphs "showed no cause of action against the defendant," for various reasons thereinafter set forth in subdivisions *a, b, c, d,* and *f* of the demurrer, including the contentions that neither the conductor nor the unnamed employee appeared, from the allegations in the petition, to have had any authority to engage Darden, or to have acted within the scope of his authority in engaging him, and that Darden's conduct was not a proximate result of the negligence of the defendant in carrying the plaintiff beyond her stopping place. The plaintiff amended by striking from the petition subsections *c* and *d,* referred to in the demurrer and quoted above, and thereupon the defendant renewed its demurrer to the

last clause of paragraph 5 and to the other paragraphs objected to, and further insisted that, in view of the withdrawal of the said subsections *c* and *d,* alleging negligence upon the grounds therein mentioned, the plaintiff thereby abandoned the allegations in said paragraphs as to the conduct of the employees of the defendant in engaging Darden to convey her to Cave, and as to the conduct of Darden while on the way from Kingston to Cave, and therefore the said allegations were irrelevant and immaterial and were not shown to be any part of the cause of action against the defendant, and should for this reason be stricken. The demurrer and the amended demurrer were overruled, and the defendant thereupon filed exceptions pendente lite. The case proceeded to trial, and the allegations made in the petition were supported by the testimony of the plaintiff, and the trial resulted in a verdict for $1,000 in her favor.

According to the plaintiff's testimony (without reviewing such portions as are unnecessary for the determination of this case), when she told the conductor that he had conveyed her beyond her destination, he said he would make arrangements at a stable at Kingston to have her carried home from that place, and she suggested that a gentle horse be secured, as she was "scared of stock," and "then they went and drove up there with a mule and buggy, and *this man that staid at the depot* [italics ours], he calls to him [Darden] and says 'There is this lady for you;' and he went on with me to the buggy and hope [helped] me in, and says this man will carry you home." She further testified, that she had never before seen the man that was driving the buggy, and did not know his name. "The depot agent took me out there and helped me in the buggy. Yes, sir, *that was the telegraph operator* [italics ours], the man that worked around there for the railroad at the depot." She testified that on the way to her home the defendant made improper proposals to her, indicating that he wished to have sexual intercourse with her, and she tried to get out of the buggy, but he prevented her from doing so, and when they reached her home she went into the house, and Darden remained outside in the buggy, talking to her husband and her son-in-law, until she came out of the house and told them to stop talking to him and come in the house, and thereupon "Darden left in a hurry." She testified that she would soon be 61 years of age, and was the mother of 13 chil-

dren, 11 of whom were living, the eldest being 43 years of age. Her husband testified that his wife came home in a buggy with Darden, that she got out of the buggy and went into the house, that Darden then spoke to him and inquired if he was Mr. Jackson, and upon his answering "Yes," said he wanted to see him for a minute, that he went out where Darden was, and as soon as he came to the buggy, "right up against the wheels of the buggy," he smelled whisky, and that after he had been talking to Darden for a few minutes his wife came out on the porch and told him "not to stand there and talk to that thing, he wasn't fit for anybody to talk to; and he just took the lines and whirled his mule and went away from there."

A number of witnesses testified that they had been acquainted with Darden during the entire 21 years of his life, or for many years, and that his previous reputation in the community where he lived, for politeness, decency, and gentlemanly conduct towards women, was good, and that they had never heard that he was a drunkard or even a drinking man, though two or three of them said that he did take a drink occasionally. Darden himself testified that he was 21 years old and had lived in and around Kingston all his life, and that on the night in question Mr. Broadwater, the night telegraph operator at Kingston, employed him to carry the plaintiff to her home, at about 7:30 p. m.; that he had indulged in two or three drinks of whisky between the arrival of train No. 1 at 5:30 p. m. and the hour of 7:30 p. m.,— "three drinks, moderate size drinks," but was not drunk and felt the effects of the liquor "very little;" that while on the road he made no improper remarks to the plaintiff and no indecent proposals, as she gave him no "room to say anything to her," and he certainly would not "have said anything to her, on account of her age, if nothing else," and that he had never seen or even heard of her before; that she did not try to leave the buggy, and said nothing about getting out of the buggy; that there were "a good many houses along that road," and in his opinion one could not go 400 yards along any part of the two miles without passing a house; that he reached her home within 20 or 30 minutes, and she got out of the buggy and went into the house; that he had some conversation with her husband and sought to buy some smoking tobacco from a little commissary in the yard, whereupon the

plaintiff's son-in-law, Couch, came out of the house, approached the buggy, and told him they would sell him nothing, and ordered him to get out of the yard; that he asked Couch to explain what he meant, but Couch repeated his order to leave, and he drove off without being told why he was ordered to go; that when the plaintiff came back out of the house she said something, just as he was turning his buggy around, but he did not understand what she said. He testified that the plaintiff conversed with him on the way out to her home, and seemed "to be pretty mad about the conductor overlooking her," and said she was going to sue the road and "they would pay for it, pay her for putting her off two miles from her destination." Darden admitted that he had been convicted on a criminal charge growing out of this alleged occurrence, and stated that, though his attorney had filed a motion for a new trial, he paid a fine of $45 after some months, as he did not "wish to be embarrassed before the court."

The conductor, Adams, testified, that when he discovered that he had carried the plaintiff beyond her destination he proposed to send her back in a buggy from Kingston, if this would be satisfactory to her, and that she agreed to this, and when the train reached Kingston he "*stepped up to the young man that worked there* [italics ours] and asked him would he get somebody to carry her down there [back to Cave], and he said he would get somebody before I left Kingston. He said he would see that the lady got carried back in a buggy. He says, 'You go on, I will get her back;' and I says, 'Whatever the bill is I will pay it when I come back the next morning;' and the next morning I come back and I said, 'You got her back all right, did you?' He said, 'Yes, everything is all right;' and I asked him what it was, and he said $1.25, and I pulled it out and paid it. I did that to get the old lady back home." The flagman testified as to the mistake in carrying the passenger by her destination, and corroborated the conductor as to the conversation between him and the plaintiff. Broadwater testified, that he employed Darden to take the plaintiff from Kingston to her home for $1.25, and went back to the depot and told her that he had a way for her to get back home, and escorted her to the buggy and helped her in. He further testified: "Mose Darden was not drunk that I could see. If he was drinking I could not smell his breath. I never

went up to examine him to see if he was drinking. I suppose if he was drinking I could have told it. I did not notice anything like that at all. No, sir, he appeared to be sober and all right, just like he is to-day." He testified that he "had been living around Kingston for twenty years," and was acquainted with Darden and with Darden's general reputation, and "He is just as nice a boy as I know of around that place." He further said: "I don't know that he drinks some. I never have seen him drunk. I don't know whether he does drink whisky or not. I have not seen him drink any, and haven't known of his drinking whisky, and never heard of his drinking it." He said, that he was the telegraph operator for the Western and Atlantic Railroad Company at Kingston, and was operator there at the time of the occurrence complained of by the plaintiff; that he went on duty at 11 o'clock at night, and just "happened" to be at the depot when the train arrived on the occasion in question, and had been there only a short time, perhaps 10 or 15 minutes, when the train came; that Espey was the express agent at Kingston, and he did not know that Espey waited that day to deliver liquor that came on train No. 1, which arrived before the train upon which the plaintiff was a passenger. He said that Darden charged $1.25 to carry the plaintiff home, and he told Darden the conductor would pay it, "that the conductor would do what was right. I told him I would guarantee the pay, the conductor said he would pay me the next morning. He [Darden] said he would charge $1.25, and I said, 'All right.'" Darden, when recalled by the plaintiff, said he did not remember "who got the shipment of liquor that afternoon on No. 1. It was mine, and I guess it was shipped to me."

*Tye, Peeples & Tye, Neel & Neel,* for plaintiff in error.

*Colquitt & Conyers, William T. Townsend,* contra.

WADE, C. J. (After stating the foregoing facts.)

1. It will be observed that the plaintiff's cause of action as finally amended is broadly grounded upon the proposition that when she became a passenger and paid her fare to a given point, it was the duty of the defendant company to stop the train at her destination a sufficient length of time to allow her to leave it with safety to her life and person; and that if the plaintiff was carried beyond her stopping place by no fault of hers, but by the failure of the defendant company's conductor and agent to do his

duty in that respect, she might recover for any resulting damage. It is insisted, that the insulting language and conduct of Darden, which mortified, shocked, and humiliated her, was a direct proximate result of the failure of the defendant company to convey her to her destination, or to afford her an opportunity to alight there in safety, and that therefore the jury were authorized to find damages in an amount sufficient to salve the injury to her wounded feelings.

It is unnecessary to say that for the breach of its duty to afford the passenger an opportunity to alight in safety at her destination, the plaintiff could have recovered damages for the injuries *directly* resulting therefrom. In *Burnett* v. *Rome Railway & Light Co.,* 7 *Ga. App.* 323 (66 S. E. 803), the petition alleged that the plaintiff was an old lady, unacquainted with the streets or their condition in the city of Rome, where the defendant operated a line of street-cars, and that she contracted with the conductor, in consideration of a fare of five cents, to convey her as a passenger from the point where she entered the car to "Cherokee street in south Rome; that the conductor failed to comply with his contract" to carry her to Cherokee street, but put her off at East Third street, and gave her a transfer which compelled her to walk a quarter of a mile to another car, and in going to this car she fell and dislocated and broke her hip; that if she had known that she could not be carried by the street-car to south Rome without having to walk this distance, on account of her age, infirmity, and defective eyesight, she would have employed some other means of conveyance, and would not have attempted to get on the car. This court said: "No direct connection between the defendant and the fall is alleged. The plaintiff sues for the personal injury received through the fall. *Held,* that the defendant's wrong, if any, was not the proximate cause of the injury; that the petition does not state a cause of action; and that it was properly dismissed on demurrer." Again, in *Central of Georgia Ry. Co.* v. *Dorsey,* 116 *Ga.* 719 (42 S. E. 1024), it was said: "Damages traceable in some measure to a tortious act, but resulting chiefly from other and contingent circumstances, and not the legal or natural consequence of the act, are too remote to be the basis of recovery against the wrongdoer. It follows that where a female passenger on a railroad-train was carried beyond her station, and the train stopped

near the next station, and the passenger walked at night and without escort through the town to the house of a friend in that town, she should not be allowed to show that she was frightened by hearing loud voices of negro men who were walking behind her, unless it is also made to appear that the locality was one in which such occasion for fright was likely to occur *and that* the railroad company had notice of this [italics ours]." Whether alleged negligence is the proximate cause of an injury is generally a question for the jury, but where the undisputed evidence clearly shows that the injury complained of was not the natural or proximate result of the defendant's conduct, negligence, or breach of duty, but resulted through an intervening agency, not invoked or brought into play by the defendant, no recovery would be authorized on this ground.

In the case of *Central of Georgia Ry. Co.* v. *Price,* 106 *Ga.* 176 (32 S. E. 77, 43 L. R. A. 402, 71 Am. St. R. 246), it was held: "Where, through the negligence of the conductor of a railway company, a passenger on its cars has been carried beyond the point of her destination, such conductor, in the absence of express authority so to do, can not constitute the proprietor of a hotel, who is entirely unconnected with the company, its agent for the purpose of providing safe and comfortable lodgings for the passenger until she can return on the company's train to her destination. It follows, therefore, that the company is not liable for any injuries or damage such passenger may have sustained while at the hotel, in consequence of any negligence on the part of its proprietor." That case on its facts is closely akin to the case under consideration, so far as relates to the contention that the conduct of Darden was a proximate result of the breach of the contract of carriage on the part of the railroad company for which a recovery was authorized. The Supreme Court there held, that while a conductor on a passenger-train of a railway company was the agent of the company and the company was bound by all of his acts within the scope of his employment, his business was to superintend the running of the train and to look after the comfort and safety of the passengers, and "do such other work, in and about the running of the train, as is imposed upon him by the rules of the company or by law;" but, "being only an agent, he had no authority, without express power conferred by the company, to appoint a sub-

agent. He could not delegate to another, an agent of his own appointment, the powers conferred upon him. Civil Code [of 1895], § 2999 [Civil Code of 1910, § 3571]. It was not within the scope of his business to constitute the proprietor of a hotel the agent of the company for the purpose of taking care of the plaintiff during the night." In that case the Supreme Court said it was argued (as it was in this case) that "Whether or not the proprietor of the hotel was the agent of the company, the contract of carriage was not completed, and it was the duty of the company, by its agents, safely to care for the passenger until they had delivered her at her destination." As to this the court said: "Admitting, for the sake of the argument, that this is true, we still think that the company would not be liable for the consequences of the landlord's negligence. The negligence of the company consisted in passing the station where the passenger desired to alight, without giving her an opportunity to get off. Taking her version of the manner in which she was injured, the injury was occasioned by the negligence of the proprietor of the hotel or his servants in giving her a defective lamp. The negligence of the company in passing her station was, therefore, not the natural and proximate cause of her injury. There was the interposition of a separate, independent agency, the negligence of the proprietor of the hotel, over whom, as we have shown, the railroad company neither had nor exercised any control."

The decision in that case likewise definitely holds that a conductor entrusted with the running of a train and with the duty of caring for the passengers thereon is without authority to engage subagents to care for such passengers when no longer upon his train. It is alleged in the petition in this case that an employee of the defendant, other than the conductor, at his instance and request engaged the driver who conveyed the plaintiff to her home; and evidence was introduced to show that the driver, Darden, was in fact engaged by another employee or "agent" of the company, who possessed authority to bind the company, and that this agent had knowledge, at the time he contracted with Darden, that the latter was a man of no character, was then drinking or drunk, and had actually received whisky at the station where this agent was employed on that very day, with the constructive knowledge, at least, of said employee. While it may be true that an agent of

the defendant, actually in charge of its station, and burdened with the responsibility in some measure of caring for passengers there leaving its trains or taking passage thereon, might have authority under some circumstances to bind the railroad company by contracts made in an effort to provide for the safety and comfort of such passengers, in our opinion the positive, uncontradicted evidence, in this case shows that Broadwater, the person who engaged Darden to convey the plaintiff to her home, was not in fact such an agent of the defendant at Kingston, nor was he (so far as is disclosed by the evidence) in charge of the depot, waiting-room, etc., or specially authorized or empowered to look after passengers or care for their comfort and safety at that point, but was merely a night telegraph operator, who happened to be idling at the depot, and was not even on duty when he contracted with Darden. Mrs. Jackson said that "this man that stayed at the depot" put her in charge of Darden; and, while she stated further on that the "depot agent," helped her into the buggy, she added "that was the telegraph operator, the man that worked around there at the depot." Darden testified that Broadwater was the "night operator at Kingston," and, while Adams, the conductor, said that he arranged with "the young man that worked there" to have the plaintiff conveyed to her home, Broadwater himself said positively that he "worked there" as telegraph operator and went on duty as such operator "at 11 o'clock at night." It is apparent, therefore, that under this proof Broadwater was not an agent in general charge of the station at Kingston, and in fact there was other testimony that one Cliff was the depot agent there, and certainly it can not be assumed that the "night operator," in charge of the telegraph instrument and upon whom perhaps devolved some other minor duties, was such an agent of the defendant company as, in the absence of proof of any special powers, would be invested with broader authority than the conductor to employ a subagent for the company, or that he would himself be acting within the scope of his employment in taking charge of the continued transportation of a passenger by private conveyance from the station where he worked to her home in the country, or was even necessarily authorized to make arrangements for the comfort and safety of passengers at the station itself, where his ordinary work of an entirely different character was to be performed.

The rule laid down in the *Price* case, supra, that a conductor would have no authority to employ a subagent. to act for the railroad company in caring for a passenger, would certainly apply equally to a telegraph operator in the service of such company. It is therefore clear that no recovery for the acts or conduct of Darden could be had against the defendant on the theory that he was a duly empowered agent of the defendant; and, as was held in that case, the negligence on the part of the company in passing her station was not the natural and proximate cause of her injury, for the injury was occasioned by the interposition of a separate, independent agency, to wit, the conduct of Darden, over whom the railroad company neither had nor exercised any control, and no recovery for the conduct of Darden would be authorized because of the breach of the contract of carriage, in failing to convey her in safety to her destination.

2. In *Central of Georgia Ry. Co.* v. *Dorsey,* supra, where a female passenger was carried beyond her station, and the train stopped near the next station, and the passenger walked at night and without escort through the town to the house of a friend, it was held: "She should not be allowed to show that she was frightened by hearing loud voices of negro men who were walking behind her, unless it is also made to appear that the locality was one in which such occasion for fright was likely to occur and that the railroad company had notice of this." The uncontradicted evidence in the case under consideration entirely removes any suggestion of notice to the agent of the railroad company that injury or danger might result to the plaintiff by placing her in Darden's care, and therefore no recovery would be authorized, under the principle referred to in the above ruling of the Supreme Court, on account of a breach of the general duty resting upon the employees of the carrier to properly safeguard a passenger under their charge, or at all events not to deliberately place her in a position which they knew, or could have known by the exercise of proper care, was one from which wrong or injury to her might naturally be expected to result. If it be conceded that the proof as a whole might in any possible view have authorized the jury to infer that Broadwater was the agent in charge of the station at Kingston, and, though not authorized as such agent to employ a subagent, for and in behalf of his company, to convey a passenger

from the station to her proper destination, under the precise circumstances of this case, that nevertheless the carrier would be liable for his acts in not only failing to provide for the safety of a passenger leaving one of its trains at his station, but in deliberately and with knowledge· (actual or potential) placing her in a position where it might reasonably and naturally be expected she would be subjected to insults or even to personal danger, there is no evidence in the record to authorize a finding that he was in any degree negligent, in that he failed to exercise ordinary *or even extraordinary* care in engaging Darden to convey the plaintiff to her home, or in failing to anticipate and guard against what followed. The undisputed evidence of several witnesses was that Darden was a young man of hitherto unblemished reputation, generally polite to ladies, and not a drunkard, or even, in common parlance, "a drinking man," though some witnesses other than the night operator testified he sometimes took a drink, and he himself admitted that upon this particular occasion he had imbibed three "moderate" drinks ·during the afternoon, between 5:30 and 7:30 p. m., or within an hour or so of the time when he undertook to convey the plaintiff to her home.

It is true there was testimony that a shipment of liquor came to Kingston that very day on an earlier train of the defendant, which was addressed to Darden, but it was not shown that Darden himself actually received this shipment that day, and Broadwater was not the express agent and had no actual or constructive knowledge of this fact. Broadwater not only asserted that he was unaware that Darden ever drank at all, but said that Darden appeared perfectly sober when he engaged him, and he detected at that time no odor of whisky upon or about his person, and saw nothing whatever in his appearance or conduct to arouse the suspicion that he was not his usual self. Furthermore, as demonstrating his extraordinary care in selecting one he believed and had reason to believe was a proper person, he said he had himself known Darden personally for a long time, and had always considered him as reputable and decent a young man, "or as nice a boy," as there was in the community. He not only did not carelessly entrust the plaintiff to a stranger or to one of doubtful reputation or antecedents, but· sought out and procured a man whom he had known for many years and had every reason to believe

from his general reputation was a man of established good character. No witness asserted any fact whatever, which was shown to be within the knowledge of Broadwater at any time prior to his employment of Darden, that could have possibly put him on notice that Darden was by nature or character an unfit person, or was at the time in an unfit condition to safely and respectfully convey an old lady a distance of two miles from the station, through a little town and along a public highway traversing a thickly settled country, early in the evening, when the shades of night had barely descended and the presence of other travelers along the same road might reasonably be expected.

It is true that Mrs. Jackson said she smelt whisky on Darden while on the way, and her husband likewise said that he noticed the same odor on or about him after the plaintiff reached her home and entered the house, when he himself came quite close to Darden or "walked right up against the wheels of the buggy" in which Darden was sitting. However, the fact that an odor of whisky emanated from Darden on the road, or after he reached the home of the plaintiff, does not necessarily show that any odor of that character hung around him or was discoverable to even the keenest olfactory nerves at the time Broadwater engaged him as a driver, or that he was then in the slightest degree perceptibly under the influence of liquor. Even the plaintiff failed to detect any such odor until some minutes after she had been seated by his side in the buggy, and both she and her husband may have come into much closer proximity to Darden than did Broadwater, and we can not hold as a matter of law that the exercise of even extraordinary diligence on the part of the latter would have required him to sniff Darden's breath at close range, to determine whether there might perchance be some alcoholic stimulant in his stomach, before putting the plaintiff in his charge. He testified positively that he did not know Darden ever drank, that Darden showed no signs of intoxication and appeared to be his usual self, and, in the absence of anything to the contrary, there is nothing from which it may be inferred that he was guilty of negligence in selecting Darden and entrusting the plaintiff to his care. Though Mrs. Jackson declared that Darden was under the influence of whisky while on the way from Kingston to her home (as already stated), she did not discover that he had been drinking at all until after

she was seated in the buggy with him, and they had proceeded "about half through the town," when she noticed a very strong odor of whisky. And on cross-examination she further said: "I didn't pay no attention to smelling whisky on him until after I got in the buggy and going on down the road just passing stores out there at the far end of the stores when I first noticed it, and it was just after that when he made the improper proposals to me." In fact there is nothing in her testimony, apart from the odor of whisky (which she failed to discover until she had been seated in the buggy with him for a considerable time) to indicate or even suggest to her that Darden was either drunk or drinking, until he grossly insulted her, and no previous language or conduct on his part is shown by her testimony, or by the testimony of any other witness, that could apparently have indicated to Broadwater, or to any other observer that he was either drunk or had been drinking.

There was nothing to put Broadwater on notice that Darden was not entirely sober and rational, and therefore not a safe person to whom the plaintiff could be entrusted; and there was nothing shown which could reasonably lead him to anticipate that Darden, sober and clothed in his right mind, so far as Broadwater did or could discover, would gratuitously insult an elderly woman placed in his care, whom he had never seen or heard of before, during a short drive of two miles, on a public highway and through a well settled country, where a call for assistance would probably bring a ready response at any point along the way. The testimony shows that the plaintiff was more than 60 years of age at the time, and had borne 13 children, 11 of whom were still living and one of whom was over 40 years of age; and that Darden was only 21 years old, had always borne an excellent reputation in the community in which he lived, and this reputation was known to Broadwater. Certainly Broadwater could not have even imagined under these circumstances that such a man, hardly more than a boy, whom he had no reason to suspect was otherwise than sober and rational at the time, would propose sexual intercourse with a woman old enough to be his grandmother, and who was in fact a grandmother, whom he had never seen or heard of before. The thing was unnatural, and certainly it is unbelievable that a boy of his previous good reputation could have been guilty of so foul an

outrage against decency and womanhood, or could show so little respect for age, unless he was altogether distraught and wholly unbalanced at the time from the effects of some powerful drug or maddening intoxicant. This is especially so when it is recalled that after he had repeatedly insulted the plaintiff, and she had clearly indicated her extreme displeasure on that account, he nevertheless accompanied her to her very home itself, and that when she left his buggy and entered her house he actually remained of his own volition in the presence of her husband, and engaged in conversation with him, and only departed when ordered by her son-in-law to leave. He must have been temporarily insane from drink to venture within reach of the plaintiff's husband and to tarry unnecessarily in his presence and engage him in conversation, after what had immediately preceded, and yet neither the plaintiff, nor her husband, nor her son-in-law, Couch, testified that his *movements or conversation* after he reached the home of the plaintiff indicated that he was intoxicated or mentally unbalanced, and in fact the plaintiff's husband did not testify that he observed *anything* whatever that might indicate that Darden had been indulging in intoxicants to any extent, except the odor of whisky about his person. It is therefore easy to understand why Broadwater could not observe anything in Darden's conduct a half hour earlier to put *him* on notice that Darden was then drunk or drinking or mentally unbalanced. The jury found that Darden insulted the plaintiff as she alleged, and his extraordinary conduct can only be rationally explained on the theory that his reason was temporarily unsettled from intoxicants (of which however Broadwater had no knowledge); and since nothing appears from his general reputation that would have put Broadwater on notice that he was not otherwise a fit person, and he had no knowledge or reason to suspect that Darden was drinking or drunk, it follows that there was nothing to authorize the inference of negligence on his part in entrusting the plaintiff to the care of Darden, or that for this reason the defendant should be mulcted in damages.

3. No general demurrer to the plaintiff's petition was interposed, as nominal damages were of course recoverable on the part of the plaintiff for the breach by the defendant of its contract of carriage. Except as passed upon generally in the two preceding divisions of this opinion, it is unnecessary to deal with questions

presented by the demurrers interposed. Under our view of this case, it is likewise unnecessary to consider or discuss the various special grounds of the motion for a new trial, not covered in effect by the foregoing opinion. A verdict for $1,000 can not be sustained as merely nominal damages; and since there was no evidence to authorize this verdict, the trial judge erred in overruling the motion for a new trial.

*Judgment reversed. George, J., concurs. Luke, J., dissents.*

LUKE, J., dissenting. This case arose as an action by a female passenger against a railway company for injuries alleged to have been the proximate result of the defendant's negligence in carrying her beyond the point of her destination. The jury returned a verdict for $1,000 in favor of the plaintiff; and, in my opinion, from the evidence (the weight and credibility of which are to be determined by the jury alone), they were authorized to find that the plaintiff boarded the defendant's train at Atco, paid her fare to Cave, and told the conductor that she wished to get off the train at the latter point; that the conductor agreed to stop the train at Cave and negligently omitted to do so, carrying her to Kingston, two miles beyond the point of her destination; that, upon passing Cave, she made complaint to the conductor, who then promised to stop the train at Kingston and there send her back to Cave; that, upon arriving at Kingston, the conductor put her off, as he had agreed to do, and there instructed the railway company's local agent to send her back to Cave; that the local agent thereupon employed a young man to take her back to Cave in his buggy; that it was 7 o'clock p. m. before the train arrived at Kingston, and it was dark before arrangements for her return to Cave were completed; that she was wholly unacquainted with Darden, the person employed to take her from Kingston to Cave, though the agent knew him well; that he had received a shipment of whisky, arriving on one of the trains of the defendant on the same afternoon, and the agent knew, or in the exercise of any sort of care could have known, that he was then and there, at the time of his employment for that purpose, either drunk or in a semi-intoxicated condition; all of which was unknown to the plaintiff until after the local agent had placed her in Darden's buggy and she and Darden were well on the way to Cave; that, as a result of Darden's drunkenness, he consumed at least one hour in going the two miles from

Kingston to Cave, during which time he repeatedly proposed sexual intercourse with the plaintiff, used to her other insulting and humiliating language, and refused to allow her to get out of the buggy, as she attempted to do in resentment of his insults; all of which the local agent knew, or in the exercise of any care ought to have known, was calculated to occur on such a trip along a country road at night with a woman in the power of a drunken man (I am forced to the conclusion that the jury were authorized to find that Darden was drunk, because he admitted that he had three drinks of whisky between 5:30 p. m., and 7.30 p. m., the time when the plaintiff got in his buggy); that, immediately upon arriving at her house at Cave, the plaintiff complained to her husband of Darden's conduct, and followed up her complaint by causing Darden to be indicted and convicted for his said criminal conduct.

This case differs from the cases of *Burnett, Dorsey,* and *Price,* cited in the majority opinion. In the *Price* case the Supreme Court held that the conductor had no authority to employ the landlord of a hotel to look after the plaintiff for a night. Further, in the *Price* case the plaintiff was injured by the explosion of a kerosene lamp in the hotel. The injuries received by the plaintiff in the *Price* case were not the natural and proximate consequence of carrying the plaintiff beyond her destination. In the exercise of extraordinary care, no such injury as did occur to the plaintiff in the *Price* case could have been foreseen by the conductor or any agent of the railroad. The negligence of the proprietor of the hotel was a separate and independent agency, not connected with the railway company. The same distinction may be drawn between the instant case and the case of *Burnett.* In that case the plaintiff, in walking from East Third street to Cherokee street, in the city of Rome, fell on the street and dislocated and broke her hip. There was a separate and independent agency responsible for her injuries. No amount of care would have caused the railway company, in the *Burnett* case, to have anticipated that any such injury would have occurred. In the *Dorsey* case the plaintiff had been carried by her station, and was put off near the next station, to walk home. In walking home she was frightened by loud voices of negroes who were walking behind her. No amount of care would have caused the railway company, in the *Dorsey* case, to

have anticipated that the passenger would be frightened, as she pleaded. As was held in the *Dorsey* case, if the evidence had made it appear that the locality was one in which such injury was likely to occur, and that the railroad company had notice of it then the railroad company would have been liable.

In the instant case it is my opinion that, when the agents of the railway company placed Mrs. Jackson in charge of Darden, they must have known that he was at least in a semi-intoxicated condition. If, from the evidence, the jury were authorized to find that the local agent knew, or in the exercise of care could have known, the facts respecting Darden's intoxication, the railway company was bound to anticipate that just such injuries as occurred would occur. In the *Price* case, if the landlord of the hotel had been intoxicated, and his intoxication had been known to the conductor and unknown to Mrs. Price, and her injuries had been the same as in the instant case, the ruling in that case, on the question of proximate cause, would likely have been different.

I do not think it necessary to the plaintiff's right to recover in this case that it be shown that the conductor or the other agent of the railway company had authority to employ Darden as a subagent. And it is not on the idea that the agent had authority to employ Darden that I disagree with the majority opinion in this case, but because of the fact that the agent placed this lady, at a time when she was a passenger, into a buggy with such a man as the jury were authorized to find Darden to have been. His conduct on the road with Mrs. Jackson was just such as a person with common experience, and such knowledge as the agent had, might know would happen.